**SAWYER & LABAR LLP**
ADRIAN SAWYER, State Bar No. 203712
sawyer@sawyerlabar.com
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820

**SAWYER & LABAR LLP**
REBECCA MACLAREN, State Bar No. 211788
maclaren@sawyerlabar.com
6060 Center Drive, 10th Floor
Los Angeles, California 90067
Telephone: (310) 341-2922

**BROOKS LLC**
Ross B. Brooks (to be admitted *pro hac vice*)
Ross@BrooksLLC.com
8 West 126th Street, 3rd Floor
New York, NY 10027
Tel.: (212) 516-6475

*Attorneys for Plaintiff-Relator*

FILED
CLERK, U.S. DISTRICT COURT
11/21/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: GSA DEPUTY

FEE PAID
NO CV 30

N/S

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

THE UNITED STATES AND THE STATE OF CALIFORNIA,

ex rel. ELDERCARE WATCH, LLC,

Plaintiff-Relator,

vs.

SUPPORTIVE HOSPICE CARE CORP.; A TO Z HOSPICE CARE, INC.; CASA PACIFICA NURSING CENTER, LLC; LA VETA HEALTHCARE, INC.; ARTESIA PALMS CARE CENTER; P & J HOSPITAL, INC.; and 2210 SANTA ANA OPCO, LLC,

Defendants.

Case No. 2:25-CV-11218-FMO-(Ex)

**COMPLAINT FOR DAMAGES**

**JURY TRIAL DEMANDED**

**FILED UNDER SEAL IN ACCORD WITH 31 U.S.C. § 3730(b)(2)**

Plaintiff and *qui tam* Relator ElderCare Watch, LLC, by and through its attorneys, brings this action on behalf of the United States of America ("United States" or "the Government") and the People of the State of California, complaining and alleging as follows:

## I. STATEMENT OF THE CASE

1. This action is brought under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("False Claims Act" or "FCA") and the California False Claims Act, Cal. Gov't Code §12651(a)(1) and (2) ("California FCA"), to recover assessments and civil penalties on behalf of the United States and the State of California, arising from false and/or fraudulent claims caused to be presented by Defendants Supportive Hospice Care Corp. and A To Z Hospice Care, Inc. (collectively, "Supportive") as a result of their illegal scheme with the other Defendants, including Casa Pacifica Nursing Center, LLC d/b/a Harbor Villa Care Center ("Harbor Villa"); La Veta Healthcare, Inc. d/b/a MainPlace Post Acute ("MainPlace"); P & J Hospital, Inc. d/b/a Bell Convalescent Hospital ("Bell Convalescent"); Artesia Community Healthcare, LLC d/b/a Artesia Palms Care Center ("Artesia Palms"); and 2210 Santa Ana OPCO, LLC d/b/a Advanced Rehab of Tustin ("Advanced Rehab") (all collectively, "Defendants").

2. The violations arise out of false claims for payment made to Medicare, Medicaid and other federally-funded Government healthcare programs, including CHAMPUS and TriCare (collectively, "Government Healthcare Programs").

3. From at least 2019 to the present (the "Relevant Period") and continuing into the future unless enjoined by this Court, Defendants have submitted, and will continue to submit, thousands of false claims to Government Healthcare Programs, primarily Medicare and California's Medicaid program, Medi-Cal.

4. Supportive accomplished this by admitting and/or retaining patients whom Supportive knew did not meet federal eligibility criteria for hospice care, but nevertheless billing Government Healthcare Programs for hospice care for those

patients, knowingly retained those patients for years, and made false records and statements to hide the illegal scheme.

5. Defendants also engaged in conspiracies for Supportive to pay kickbacks to the other Defendants in return for accepting patients referred by Supportive.

6. These kickbacks were disguised as payment for a higher level of care than the patients received and that their medical condition required, even though Supportive and the other Defendants knew the true, lower level of care that the patients received.

7. The resulting false claims caused the Government to pay out funds that it would not have paid but for the false claims and thereby unlawfully enriched Defendants and their owners, officers, and executives at the Government's expense.

8. Pursuant to the FCA and California FCA, Relator seeks to recover damages and civil penalties arising from the false or fraudulent claims that Defendants submitted or caused to be submitted to the United States and to the State of California.

## II. JURISDICTION AND VENUE

9. This is a civil action arising under the laws of the United States.

10. This Court has jurisdiction over this action pursuant to 31 U.S.C. §3732(a), which confers jurisdiction to this Court for actions brought under the FCA, 31 U.S.C. §§ 3729 *et seq*. This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.

11. Venue is proper in this district because every Defendant is located in and/or transacts business within this District and relevant acts and omissions occurred in this District.

12. This Court has personal jurisdiction over every Defendant because the acts and omissions complained-of occurred within this District and because the hub of Defendants' conspiracy, Defendant Supportive, is located here.

13. Relator is an "original source" within the meaning of the False Claims Act of the information upon which the complaint is based.

## III. PARTIES

### 1. *Qui Tam* Relator

14. Plaintiff-Relator ElderCare Watch, LLC, is a Limited Liability Corporation, organized under the laws of the State of Delaware.

15. Relator conducted an independent investigation into Defendants' wrongdoing and acquired documents and other evidence supporting the allegations in this Complaint. Consequently, Relator has direct and independent knowledge of the false claims and certifications that Defendant has submitted to the Government.

### 2. Defendants

16. Defendant Supportive Hospice Care Corp. is a provider of hospice care services. The company's headquarters are located at 1202 Monte Vista Ave., Suite 4, Upland, California, 91786.

17. Defendant Supportive Hospice Care Corp.'s Chief Executive Officer ("CEO") is Nassi Pourang, who also serves as its Agent, corporate Secretary, and Director.

18. Defendant Supportive Hospice Care Corp.'s Chief Financial Officer ("CFO") is Lior Matian, who also is a Director.

19. Defendant A To Z Hospice Care, Inc. ("A To Z")'s head office is also located at 1202 Monte Vista Ave., Suite 4, Upland, California, 91786.

20. Defendant A To Z's CEO is Lior Matian, who also serves as its Agent, CFO, and Director; Nassi Pourang is the corporate Secretary, and also a Director.

21. Because Defendants Supportive Hospice Care Corp. and A To Z Hospice Care, Inc., acted as a single entity, they are collectively referred to herein as "Supportive" or "Supportive Hospice."

22. Defendant Casa Pacifica Nursing Center, LLC d/b/a Harbor Villa Care Center ("Harbor Villa") is a healthcare provider whose services include care

performed at its Skilled Nursing Facility ("SNF"). Casa Pacifica Nursing Center LLC's headquarters are located at 6300 Wilshire Blvd., Suite 1800, in Los Angeles, CA 90048; its SNF is located at 861 South Harbor Boulevard in Anaheim, CA 92805.

23. Harbor Villa's Managers are Ira Smedra and Jacob Wintner, the latter of whom is also its Agent.

24. Defendant La Veta Healthcare, Inc. d/b/a MainPlace Post Acute ("MainPlace") is a healthcare provider whose services include care performed at its SNF. La Veta Healthcare, Inc.'s headquarters and SNF are both located at 1835 La Veta Ave. in Orange, CA 92868.

25. MainPlace's CEO is Rand Looper, its CFO is Ami Sato, and its corporate Secretary is Soon Burnam.

26. Defendant P & J Hospital, Inc. d/b/a Bell Convalescent Hospital ("Bell" or "Bell Convalescent") is a healthcare provider whose services include care performed at its SNF. Bell's headquarters and SNF are both located at 4900 E. Florence Ave. in Bell, CA 90201.

27. Bell's CEO, CFO, corporate Secretary, and Director is James Park.

28. Defendant Artesia Community Healthcare, LLC d/b/a Artesia Palms Care Center ("Artesia Palms") is a healthcare provider whose services include care performed at its SNF. Artesia Palm's headquarters and SNF are located at 11900 Artesia Blvd. in Artesia, CA 90701.

29. Artesia Palms's Secretary is John Mitchell and its Managers are Josh Jergensen and Jason Murray.

30. Defendant 2210 Santa Ana OPCO, LLC d/b/a Advanced Rehab of Tustin ("Advanced Rehab") is a healthcare provider whose services include care performed at its SNF. Advanced Rehab's headquarters are located at 6442 Coldwater Canyon, Suite 100, in North Hollywood, CA, 91606; its SNF is located at 2210 East First St. in Santa Ana, CA 92705.

31. Defendant Advanced Rehab's Managers are Abraham Bak and Menachem Gastwirth, and its agent is Lexie Lopez.

32. Defendants Harbor Villa, MainPlace, Bell Convalescent, Artesia Palms, and Advanced Rehab are collectively referred to herein as the "SNF Defendants."

## IV. LEGAL AND FACTUAL CONTEXT

33. The following is the legal and factual context in which Defendant planned and carried out its illegal schemes:

### 1. The False Claims Act

34. The False Claims Act ("FCA") holds liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the United States, 31 U.S.C. § 3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id*. at § 3729(a)(1)(B). Those who violate the FCA are liable for civil penalties not less than $10,781.40 and not more than $21,562.80 per violation, three times the damages sustained by the Government, and litigation costs. *Id*. at § 3729(a)(1).

35. In addition, 31 U.S.C. § 3729(a)(1)(C) prohibits conspiring to violate, *inter alia*, any of 31 U.S.C. § 3729(a)(1)(A) or 31 U.S.C. § 3729(a)(1)(B).

36. The FCA provides that any person having information about false or fraudulent claims or records presented to the United States may bring an action for both himself and the Government and to share in any recovery. The Act requires that the complaint be filed under seal and that a Relator disclose substantially all of the material evidence within his or her possession to the Government.

37. Relator has complied with these requirements of the FCA.

### 2. Medicare and Medicaid

38. In 1965, Congress enacted Title XVIII of the Social Security Act (known as "Medicare" or "the Medicare program") to pay for the cost of certain medical services and care. Entitlement to Medicare is based on age, disability, or

affliction with certain diseases and is funded by the United States. *See* 42 U.S.C. §§ 1395 *et seq*. Outpatient prescription drugs are covered under Parts A-D of Medicare.

39. That same year, Congress also enacted Medicaid, also known as "the Medicaid program." *See* 42 U.S.C. § 1396 *et seq*. Medicaid is the nation's medical assistance program for the needy, blind, and/or disabled, including their dependent children, and is largely administered by the states, using a combination of federal and state funds. In California, the State of California and the United States each provide approximately half of the funding.

40. When a Medicare, Medicaid, or other Government Healthcare Program patient (or "beneficiary") is diagnosed as terminally ill (*i.e.*, with a prognosis of less than 6 months to live), he or she may choose to receive hospice care ***instead of*** curative care. 42 C.F.R. § 418.24.

**3. Hospice Care**

41. Hospice is a program to provide what is referred to as "palliative care" to patients instead of curative care. Palliative care "optimizes quality of life by anticipating, preventing, and treating suffering," 42 C.F.R. § 418(3), rather than treating the underlying disease. According to the Regulations, "Palliative care throughout the continuum of illness involves addressing physical, intellectual, emotional, social, and spiritual needs and to facilitate patient autonomy, access to information, and choice." 42 C.F.R. § 418.24.

42. Since the aims and treatment choices of hospice and curative care are almost always conflicting, all other Government Healthcare Program benefits are waived unless and until the election of hospice care is revoked. 42 C.F.R. § 418.24.

43. Because the *per diem* rate is expensive and excludes treating a patient's underlying disease, federal regulations provide strict conditions of participation for Hospice providers (tightly regulating the care they provide, 42 C.F.R. § 418.301 *et seq*.), including a comprehensive assessment that identifies each patient's need for

hospice care and services, including the need for physical, psychosocial, emotional, and spiritual care. 42 C.F.R. § 418.52.

44. The Federal Regulations governing hospice care list the content requirements and timelines within which the initial comprehensive assessment must be completed. 42 C.F.R. § 418.54. These Regulations also require the hospice's interdisciplinary group ("IDG"), in collaboration with the patient's attending physician (if any), to update the comprehensive assessment with changes that have taken place since the initial assessment. This reassessment must be completed at least once every 15 days. 42 C.F.R. § 418.54(d).

45. According to the Medicare Benefit Policy Manual, the IDG is responsible for the holistic care of the hospice beneficiary and is responsible for development and review of the beneficiary's plan of care.[1] At a minimum, the IDG must include hospice employees who are qualified to practice in the professional roles of doctor of medicine or osteopathy, registered nurse, social worker, and pastoral or other counselor.

46. Pursuant to 42 C.F.R. § 418.20, in order to qualify for hospice care under Medicare, an individual must be entitled to Medicare Part A and certified as terminally ill in accordance with 42 C.F.R. § 418.22. According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."

47. Throughout the relevant period, each written certification required: (1) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (2) specific clinical findings and other documentation supporting a life expectancy of six months or less; (3) the signatures of the physicians; and (4) the physicians' brief narrative

[1] Medicare Benefit Policy Manual (CMS Pub. 100-02) Ch. 9, available at http://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/bp102c09.pdf

explanation of the clinical findings that support the individual's life expectancy of six months or less. 42 C.F.R. § 418.22.

48. Medicare regulations and guidance further provide that:

> Medicare **won't** cover any of these once hospice benefit starts:
> **Treatment intended to cure your terminal illness and/or related conditions.** Talk with your doctor if you're thinking about getting treatment to cure your illness. As a hospice patient, you always have the right to stop hospice care at any time. **Prescription drugs to cure your illness** (rather than for symptom control or pain relief).
> **Care from any hospice provider that wasn't set up by the hospice medical team.** You must get hospice care from the hospice provider you chose. All care that you get for your terminal illness must be given by or arranged by the hospice team. You can't get the same type of hospice care from a different hospice, unless you change your hospice provider. However, you can still see your regular doctor or nurse practitioner if you've chosen him or her to be the attending medical professional who helps supervise your hospice care.[2]

49. These and other laws and regulations governing hospice care are intended to insure that only terminally-ill patients are admitted or retained in a hospice. An individual or his authorized representative must elect hospice care to receive it, and the first election is for up to two 90-day periods. However, patients who were initially assessed as eligible, but are found to be or become ineligible, should be converted to conventional treatment plans. 42 C.F.R. § 418.22; 42 C.F.R. § 418.25; 42 C.F.R. § 418.26(a).

---

[2] https://www.medicare.gov/coverage/hospice-care (emphasis in original).

50. In particular, when a patient is no longer terminally ill, hospice care must be terminated and the patient discharged. 42 C.F.R. § 418.26(a).

51. Hospice care providers must provide recertification summaries every 60 days to validate the need for continued hospice care.

52. As a further condition of participation in Government Healthcare Programs, hospices must comply with all federal, state, and local laws and regulations related to patient health or safety. 42 C.F.R. § 418.116.

**4. Hospice Care Fees**

53. Hospice care is paid at a per diem rate based on the number of days and level of care provided during the election period. Medicare Benefit Policy Manual, Chapter 9, § 40. Medicare pays for hospice care at four different levels: Routine, General Inpatient ("GIP"), Continuous,[3] and Respite.[4].

54. The Relator's allegations primarily concern Routine Care, which applied to most patients, and GIP, which is the higher *per diem* rate that Supportive paid to the other Defendants, in return for hospital beds for their patients.

55. Routine Care can take place in the patient's home, which can include their private residence, a nursing home, assisted living facility, or even a dedicated hospice inpatient unit, depending on the patient's needs and preference.

---

[3] Continuous Care is provided only in the home context, during periods of crisis, to maintain the beneficiary at home. Continuous care cannot be provided in a SNF, inpatient hospital, inpatient hospice facility, long term care hospital (LTCH), or inpatient psychiatric facility. A period of crisis is a period of time when the beneficiary requires the higher level of "continuous care" for at least 8 hours in a 24-hour period (midnight to midnight) to achieve palliation or management of acute medical symptoms.

[4] Inpatient respite care is a form of temporary care through which a patient may elect to receive hospice care in an approved inpatient facility such as a SNF, hospice inpatient facility or inpatient hospital for up to 5 consecutive days to give their caregiver a rest. This level of care is tied to caregiver needs rather than to patient symptoms.

56. General Inpatient Care refers to a short-term stay in a facility like a hospital or skilled nursing facility, where a patient receives intensive care for acute pain or symptom management that cannot be adequately managed at home, such as uncontrolled nausea, breathing difficulties, or severe pain, essentially providing a higher level of care at a Medicare-certified inpatient facility, such as a hospital or skilled nursing facility.

57. Medicare regulations limit inpatient care days, including GIP, such that they cannot exceed 20% of the total days a patient is on hospice care; generally, GIP is intended to be short-term stays for managing acute symptoms and should be used for a limited duration (typically a few days) per episode.

58. As a result, longer durations of GIP-level care are likely to be scrutinized by CMS, the federal Center for Medicare and Medicaid Service.

59. Routine Care is paid at a much lower rate than GIP care: Routine Care for the 2023-24 fiscal year ("FY") paid approximately $250 per day for the first 60 days, and $200 per day thereafter, while GIP care was approximately $1,300 per day ($1,400 per day within Los Angeles County).

60. For FY 2024-25, Routine Care is approximately $260 per day for the first 60 days ($275 within L.A. County), and $200 per day thereafter ($216 within L.A. County), while GIP care is approximately $1,350 per day ($1,430 per day within L.A. County).

**5. The Anti-Kickback Statute**

61. The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320-7b, makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce the referral of or "to purchase, lease, order, arrange for or recommend" any good or service reimbursable under a federal health benefits program. 42 U.S.C. §§ 1320a-7b(b)(1) (referral prohibition) & (2) (purchase, lease, prohibition, etc.).

62. "Any remuneration" means any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. *Id.* § 1320a-7b(b)(1).

63. AKS violations are a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both, and exclusion from federal health care programs for at least five years. *See* 42 U.S.C. § 1320a-7b. In addition to the statute's criminal penalties, the HHS Secretary has power to impose administrative penalties including exclusion and sanctions of $10,000 per kickback violation. *Id.* § 1320a-7a.

64. The statute's prohibition against knowing and willful conduct in disregard of the law extends to any arrangement where one purpose of the remuneration is to induce referrals. *United States v. Hong*, 938 F.3d 1040, 1048 (9th Cir. 2019).

65. Compliance with the AKS is a material condition of payment under federal insurance programs such that violating the AKS gives rise to a false claim. *United States ex rel. Macias v. Pac. Health Corp.,* 2018 U.S. Dist. LEXIS 27891, at *16-17 (C.D. Cal. Feb. 20, 2018). In other words, a claim for payment made pursuant to an illegal kickback is necessarily a false claim under the FCA.

**6. California Health and Safety Code §1746.50**

66. The California Health and Safety Code separately prohibits paying referral sources for the referral of patients to a hospice. Cal. Health & Safety Code §1746.50(a).

67. In addition, the Health and Safety Code prohibits a "salesperson, recruiter, agent, or employee who receives any form of compensation or remuneration for hospice referrals or admissions" from "provid[ing] consultation on hospice services, hospice election, or informed consent to a patient, patient's family, or patient's representative." Cal. Health & Safety Code §1746.50(b).

68. The Code further requires that "election of hospice, informed consent, completed signatures, and counsel on the election of hospice to a patient, patient's

family, or patient's representative shall only be completed by a registered nurse, licensed vocational nurse, medical social worker, chaplain, or counselor employed by the hospice." Cal. Health & Safety Code §1746.50(c).

**7. IFPA – California Insurance Code §1871.7**

69. Under the Insurance Code, it is illegal to employ "cappers, runners, steerers, or other persons . . . to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or their insurer." Ins. Code §1781.7.

## V. DEFENDANTS' SCHEMES

### 1. The Nature of Defendants' Illegal Schemes

70. Hospice care is only available to patients who: (1) have been diagnosed with a terminal illness (meaning they have a medical prognosis of less than six months to live); and (2) who have decided to forego further treatments, or whose representatives have made this decision, as many people who are eligible for hospice are no longer able to make their own decisions about medical care.

71. This paradigm makes life better for everyone; it allows those who are terminally ill to exit this life with a minimum of pain and to spend their final days with as much dignity as their medical condition permits, while also preserving Government healthcare funds so that they can be spent on people who desire treatment of their underlying diseases, rather than merely symptom management as they prepare to die.

72. Because of the nature of hospice care – treating a patient's pain and other symptoms, rather than an expensive attempt to cure the underlying disease – the Government pays only fixed *per diem* amounts per patient, as set forth in detail, *infra*.

73. Unfortunately, this capitated payment arrangement incentivizes hospice providers to find and admit patients who are less sick, and thus will need less care,

thereby leaving less money to be applied to the per *diem limit* and more money to line the hospice providers' pockets.

74. To enrich itself at Government expense, Defendant Supportive Hospice took this perverse incentive one step further by routinely admitting patients who were not even terminally ill, including beneficiaries of Government healthcare programs.

75. In order to successfully add unqualified patients to its patient population, Supportive required the co-operation of the SNF Defendants.

76. Supportive had the scalability to admit a high volume of patients, whether terminally ill or not, because many of its patients are cared for at other healthcare facilities, most notably SNF's.

77. While patients are "admitted" to hospice care that is partially provided by Supportive, Supportive itself does not provide physical facilities in which this care occurs. Instead, patients stay either in their own home, if they are well enough, or in a SNF for patients at home, Supportive provides the nursing care.

78. These SNF entities charge Supportive for the space or "bed" in which the patient actually stays; Supportive pays these charges, and then, in turn, Supportive is reimbursed by the relevant Government (or other) healthcare program for the patient's care.

79. Thus, while admitting these not-terminally-ill patients was profitable for Supportive (because the patients required less care), this scheme created a second problem: these patients were usually not very profitable for the SNF's in which the patients were often housed.

80. While SNF's prefer a hospice patient to no patient at all (which would be a negative revenue event for that bed), a more-acutely ill patient is more profitable for the SNF than the typical non-terminal patient admitted by Supportive hospice.

81. Not only are Supportive' s typical patients less profitable to SNF's by virtue of their lower level of care relative to that required by more-acutely ill patients, but those patients also generally require the SNF to make a longer-term commitment to those patients' less-profitable, lower level of care stays.

82. Accordingly, SNF's are reluctant to accept these patients.

83. Undeterred by this conundrum, Supportive' s Senior VP of Patient Operations, Kendra Oliver, and Operations Manager, Yvette Molina, found a work-around: in order to obtain SNF beds for their patients, Supportive simply paid kickbacks to the SNF Defendants (Harbor Villa, MainPlace, Bell Convalescent, Artesia Palms, and Advanced Rehab) on the order of approximately $1,000-$3,000 per referral, in order to induce these other Defendants either to accept patients from Supportive or to refer patients to Supportive.

84. The SNF Defendants, in turn, each accepted these payments as inducements.

85. These payments were unlawful kickbacks disguised as legitimate *per diem* reimbursements for GIP care in their invoices submitted to Supportive and other false statements material to CMS's payment for the underlying patients' hospice services.

86. On information and belief, Supportive billed the Government for its low-value patients at the Routine rate, even as it paid the SNF Defendants at an inflated GIP rate, despite the fact that this higher level of care was never provided to those patients. Relator's Investigator was told by Senior VP of Patient Operations ("SVP") Kendra Oliver that Supportive payed this cost because she was worried that billing CMS for GIP was likely to trigger an audit.

87. In other words, Supportive paid the SNF Defendants for services that were never provided in order to induce the SNF's to accept those patients.

88. Insofar as Supportive billed CMS for patient care at the lower Routine level while paying SNF's at the higher GIP rate, Supportive effectively admits that it

paid above market value for the services provided by the SNF Defendants for those patients.

89. While not every SNF Defendant had an employee this candid, as one employee of Defendant MainPlace explained it, "level of care will be routine level but billing will be for GIP rate for 2 days."

90. Further, in all instances, any "change of care" documentation of the SNF Defendants shows no reason for the supposed change in care level.

91. A set of text messages from February 4, 2025, illustrates that Defendants' kickbacks – and the false statements made in the billing records to hide them – were the rule, not the exception: Relator's Investigator asked Supportive Operations Manager Yvette Molina to "please send me an LOA for [Patient EBO]. Patient will be going to Palos Verdes Healthcare. Administrator is John Javier."

92. Ms. Molina responded with the "thumbs-up" emoji, and asked "What's GIP[?]."

93. The investigator replied, "1100," meaning $1,100 per day, and the next minute added, "I didn't offer any GIP tho, unless patient qualifies," to which Ms. Molina again responded with the "thumbs-up" emoji.

94. Patient EBO, born September 27, 1941,was a beneficiary of both Medicare and Medi-Cal.

95. Similarly, a text exchange between Relator's Investigator and SVP Kendra Oliver on January 20, 2025, illustrates the fact that the GIP care that Supportive paid for these patients was normally neither needed nor provided: the investigator informed Ms. Oliver that "I just lost my bed for [a patient] at Artesia Palms because we haven't paid ☹️".

96. Ms. Olver replied that an Artesia Palms employee "sent the invoice on 12-19 to Kristy for 6 days of GIP. This was the first time that we got the invoice."

97. The investigator replied, "I don't remember this being 6 days of GIP unless the patient qualified for more[.] Usually it's 2 sometimes 3 days" –

emphasizing the point that "usually," the patients were ***not*** qualified, and also that the typical kickback was 2-3 days of billing for GIP care.

98. Relators' additional representative examples alleged herein further illustrate the pervasive scope of Defendants' scheme.

**2. Supportive Paid Kickbacks to the other Defendants and Made False Statements To Get Claims Paid and To Hide Kickbacks**

99. The following are particularized, representative examples of Defendant Supportive paying for no-show "GIP" care to its co-conspirators, when only Routine care was actually provided, and Supportive's co-conspirators creating false billing records that say that GIP care was provided – when, in fact, GIP care was not actually provided.

**(a) Medicare – Patient ME and Defendant Harbor Villa**

100. Patient ME, born on July 24, 1946, was a Medicare beneficiary and, in mid-June, 2024, she needed to find a new facility, so, acting at the direction of his superiors, including SVP Kendra Oliver, Relator's Investigator reached out to other members of Defendants' conspiracy, including Defendant Harbor Villa.

101. As reflected in an e-mail sent the following morning, on June 19, 2024, from Brianna Torres, Supportive's Intake Co-ordinator to Supportive's Intake team, including SVP Kendra Oliver (among others), Patient ME was, in fact, admitted to Defendant Harbor Villa on June 18, 2024, and Patient ME's Level Of Care ("LOC") was accurately stated as Routine.

102. However, the bill that Harbor Villa sent to Supportive, and which Supportive then used as the basis of the claim it submitted for payment by Medicare for Patient ME's care, falsely stated that Patient ME received "GIP" care, as is shown by the "Change-of-care" document sent from Harbor Villa to Supportive, which falsely states that Patient ME received GIP care for June 18-19, 2024, for

$1,100 each day, for a total of $2,200 in GIP care, and another $772 in total for June 20-22, for a grand total of $2,972.40.

103. All of Ms. Oliver, Relator, Harbor Villa, and Supportive knew that this patient would receive, and in fact received, only routine care, and that all statements to the contrary were false.

104. As a result, Supportive and Harbor Villa made, or caused to be made, and conspired to make or cause to be made, one or more false statements to get a claim for Patient ME's care paid, in violation of the federal False Claims Act and the California FCA.

**(b) Medicare – Patient GM and Defendant MainPlace**

105. A similar example began on the afternoon of April 7, 2024, when Medicare beneficiary GM, born on August 21, 1946, needed to find a new facility, so, acting at the direction of SVP Kendra Oliver, Relator's Investigator reached out to other members of Defendant's conspiracy, including Defendant MainPlace.

106. The following afternoon, on April 8, the investigator was texting with Meena Sood, an Administrator at MainPlace, negotiating to place Patient GM there.

107. The investigator texted, "Patient would go in custodial and then your business office will bill for two days of GIP."

108. Ms. Sood replied, "Oh[,] so level of care will be routine level but billing will be for GIP rate for 2 days?"

109. The investigator replied, "Yes, exactly."

110. Ms. Soud then texted, "Ok[,] so routine level of care form needed plz," followed by "Pick up 6 pm?"

111. The investigator replied "6-7 pm."

112. As reflected in an e-mail sent the following morning, on April 9, 2024, from a Supportive employee to Supportive's Intake team, including SVP Kendra Oliver (among others), Patient GM was, in fact, admitted to MainPlace on April 8

(*i.e.*, the same day the investigator was texting with Ms. Sood), and Patient GM's Level Of Care ("LOC") was accurately stated as Routine.

113. However, the bill that MainPlace sent to Supportive, and which Supportive then used as the basis of the claim it submitted for payment by Medicare for Patient GM's care, however, falsely stated that Patient GM received "GIP" care. This is reflected in the "Change-of-care" document sent from MainPlace to Supportive, which falsely states that Patient GM received GIP care for April 8-9.

114. All of Ms. Soud, Ms. Oliver, Relator, MainPlace, and Supportive knew that Patient GM would receive, and in fact received, only routine care, and that all statements to the contrary were false.

115. As a result, Supportive and MainPlace made, or caused to be made, and conspired to make or cause to be made, one or more false statements to get a claim for Patient GM's care paid, in violation of the California False Claims Act.

**(c) Medi-Cal – Patient FP and Defendant Artesia Palms**

116. In September of 2024, Medi-Cal beneficiary FP, born on May 25, 1966, needed to find a new facility, so, again acting at the direction of his superiors, including SVP Kendra Oliver, Relator's investigator reached out to other members of Defendants' conspiracy, including Defendant Artesia Palms.

117. On September 17, 2024, the investigator was in a group text with SVP of Patient Operations, Kendra Oliver, and Supportive's Operations Manager, Yvette Molina. The investigator informed the two executives that he had found a hospital bed for Patient FP, but the facility, Artesia Palms, wanted to be paid for three days of GIP – even though, in fact, the patient would receive only Routine care.

118. Specifically, the investigator asked Ms. Molina to "put together an LOA . . . for Artesia Palms at 1100 GIP rate," meaning billing for three days of un-needed GIP care at $1,100 per day.

119. That same day, September 17, 2024, Patient FP was admitted to Artesia Palms.

120. In fact, Patient FP needed only Routine care for his entire stay, and would receive only Routine care.

121. Indeed, as reflected in an e-mail sent the following morning, on September 18, 2024, from Supportive Intake Co-Ordinator Brianna Torres to Supportive's Intake team, including SVP Kendra Oliver (among others), Patient FP was, in fact, admitted to Artesia Palms on September 17, and Patient FP's LOC was correctly stated as Routine.

122. However, the bill that Artesia Palms sent to Supportive, and which Supportive then used as the basis of the claim it submitted for payment by Medi-Cal for Patient FP's care, falsely stated that Patient FP received "GIP" care and, as the co-conspirators had agreed, Artesia Palms billed Supportive $3,300 for three days of GIP care at a rate of $1,100 per day for September 17, 18, and 19.

123. Artesia Palms also billed Supportive $775.62 for three days of Routine care at a rate of $258.54 per day for September 20, 21, and 22.

124. All of Ms. Molina, Ms. Oliver, Relator, Artesia Palms, and Supportive knew that this patient would receive, and in fact received, only routine care, and that all statements to the contrary were false.

125. As a result, Supportive and Artesia Palms made, or caused to be made, and conspired to make or cause to be made, one or more false statements to get a claim for Patient FP's care paid, in violation of the California False Claims Act.

**(d) Medi-Cal (L.A. Cares) – Patient FT and Defendant Bell Convalescent**

126. Another example involves Patient FT and Defendant Bell Convalescent.

127. Patient FT, born on April 9, 1963, was a Medi-Cal beneficiary through L.A. Cares and, in early April, 2024, he needed to find a new facility. Acting at the direction of SVP of Patient Operations, Kendra Oliver, Relator's investigator

reached out to other members of Defendants' conspiracy, including Defendant Bell Convalescent.

128. On Friday afternoon, April 5, 2024, the investigator was in a group text with Ms. Oliver and Operations Manager Yvette Molina. The investigator informed the two executives that he had found a hospital bed for Patient FT, but the facility, Bell Convalescent, wanted to be paid for three days of GIP.

129. The investigator told Ms. Oliver and Ms. Molina that "Bell Convalescent will take [Patient FT] ***if we can do 3 days GIP***," (emphasis added), meaning billing for three days of un-needed GIP care at $1,000 per day – even though, in fact, the patient required only Routine care, and ultimately received only Routine care.

130. That same day, April 5, 2024, Patient FP was admitted to Bell Convalescent.

131. In fact, Patient FT received only Routine care for his entire stay.

132. Indeed, as reflected in an e-mail sent the following Monday, on April 8, 2024, from Supportive Intake team member Kristy Ehoff to Supportive's Intake team, including VP Kendra Oliver (among others), Patient FT was, in fact, admitted to Bell Convalescent on April 5, and Patient FT's LOC was correctly stated as Routine.

133. However, the bill that Bell Convalescent sent to Supportive, and which Supportive then used as the basis of the claim it submitted to L.A. Care for payment by Medi-Cal for Patient FT's care, falsely stated that Patient FT needed, and received, "GIP" care and, as the co-conspirators had agreed, Bell Convalescent billed Supportive $3,000 for three days of GIP care at a rate of $1,000 per day for April 5, 6, and 7.

134. All of Ms. Molina, Ms. Oliver, Relator, Bell Convalescent, and Supportive knew that this patient would receive, and in fact received, only routine care, and that all billing statements to the contrary were false.

135. As a result, Supportive and Bell Convalescent made, or caused to be made, and conspired to make or cause to be made, one or more false statements to get a claim for Patient FT's care paid, in violation of the FCA and California False Claims Act.

**(e) Medicare and Medi-Cal – Patient MEM and Defendant Advanced Rehab**

136. Another example involves Patient MEM and Defendant Advanced Rehab.

137. Patient MEM, born on July 24, 1945, was a beneficiary of both Medicare and Medi-Cal, and, in January, 2025, she needed to find a new facility, so, acting at the direction of his superiors, including SVP Kendra Oliver, Relator's investigator reached out to other members of Defendants' conspiracy, including Defendant Advanced Rehab.

138. On January 14, 2025, Patient MEM was admitted to Advanced Rehab.

139. In fact, Patient MEM needed only Routine care for her entire stay.

140. Indeed, as reflected in an e-mail sent the following day, on January 15, from Brianna Torres to the Supportive Intake team, including SVP of Patient Operations Kendra Oliver, Vice-President of Clinical Operations, Tyler Rooze, and Operations Manager Yvette Molina (among others), Patient MEM was admitted to Advanced Rehab on January 14 and her level of care was correctly stated as "Routine."

141. However, Advanced Rehab wanted to be paid for GIP care, at the rate of $1,100 per day.

142. As a result, Relator believes that Advanced Rehab sent a bill to Supportive, which Supportive then used as the basis of the claim it submitted to CMS for Patient MEM's care, which falsely stated that Patient MEM received "GIP" care and, as the co-conspirators had agreed, Advanced Rehab billed Supportive $1,100 per day, for 2-3 days, of GIP-level care.

143. All of Ms. Molina, Ms. Oliver, Relator, Advanced Rehab, and Supportive knew that this patient would receive, and in fact received, only routine and respite care, and that all billing statements to the contrary were false.

144. As a result, Supportive and Advanced Rehab made, or caused to be made, and conspired to make or cause to be made, one or more false statements to get a claim for Patient MEM's care paid for, in violation of the False Claims Act and the California False Claims Act.

**3. Supportive Enrolled and Re-Certified Patients Whom It Knew Were Not Terminally Ill**

145. As described, *supra*, as part of its scheme to defraud Government healthcare programs, Supportive regularly and deliberately enrolled hospice patients whom it knew were not terminally ill.

146. CMS has instructed hospice providers to use Hospice Level Local Coverage Determinations ("LCD's") and other clinical tools to determine whether a Medicare beneficiary, based on his or her current clinical status and the anticipated progression of his or her illness, has a prognosis of six (6) months or less.[5] *See* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013); 79 Fed. Reg. 26538, 26566 (May 8, 2014).

147. Supportive was aware of the relevance of the LCD's in determining whether a Medicare beneficiary was eligible for hospice services.

148. Upon enrollment as a Medicare provider, a provider agrees "to abide by the Medicare laws, regulations and program instructions [applicable to it]" and acknowledges that "payment of a claim by Medicare is conditioned upon the claim

[5] Clinical indicators of a life expectancy of six (6) months or less are set forth in, among other public sources, LCDs issued by Medicare Administrative Contractors ("MACs"). MACs develop LCDs by considering medical literature, the advice of local medical societies and medical consultants, public comments, and comments from the provider community.

and the underlying transaction complying with such laws, regulations, and program instructions….” CMS-855A, §15.

149. To facilitate this scheme, Supportive's Senior Vice President of Operations, Kendra Oliver, and Vice-President of Clinical Operations, Tyler Rooze, directed the nursing and medical staff to write fraudulent diagnoses that were qualitative, and so harder for auditors to detect, such as ASCVD (Atherosclerotic Cardio-Vascular Disease), senile degeneration or dementia (rather than more objectively quantifiable diseases), typically after a face-to-face “assessment,” when a patient did not appear to have a hospice-qualifying diagnosis; in Mr. Rooze's case, sometimes doing so himself, even without the in-person “assessment.”

150. At the direction of Ms. Oliver and Mr. Rooze, Supportive's nursing staff regularly coached the patient's relatives on what answers to give so that a patient would appear to qualify for hospice care, such as falsely stating that the patient could not conduct various Activities for Daily Living (“ADL's”) without assistance.

151. Because these symptoms were non-existent, they were not recorded in the patients' charts; accordingly, a Supportive clinician was typically assigned to visit these non-terminal patients in-person or “face-to-face”/”F2F” so that a Supportive employee could then “observe” these new symptoms.

152. For example, when Supportive employee Tina Alexander notified Supportive's referral group that Patient SM “doesn't seem to be hospice appropriate, unable to find a diagnosis,” Relator's investigator followed SVP Kendra Oliver's standing orders and e-mailed back, “Hi Tina, can we send a nurse to assess in person[?]”.

153. Similarly, when a patient failed to qualify for hospice, SVP Kendra Oliver directed employee Jose Lopez to “arrange a lunch with the Np [Nurse Practitioner] please[.] I would like to review the cases that he's referred for Alzheimer's that ha[ve] been dependent of their adls [ADL's] which is causing them

to not be appropriate. I think you and I can regain his trust by looking at medicare-qualifying DX [diagnoses] and becom[e] a partner he can trust."

154. As is evident from the following examples, at the direction of senior executives Oliver and Rooze, Supportive regularly admitted patients who were not terminally ill, and then submitted, or caused to be submitted, claims Government healthcare programs for their treatment, in violation of the False Claims Act.

**(a) Medicare Patient JC – Senile Degeneration of the Brain**

155. For example, regarding Medicare beneficiary JC, born May 10, 1943, Relator's Investigator informed SVP Kendra Oliver that the doctor on staff at a non-Defendant SNF "is hesitant to write a hospice order. Brittany House is asking if they DC [discharge] the patient back to the ALF [Assisted Living Facility, *i.e.*, a nursing home], [c]an we have our doctor write the [hospice] order?"

156. Ms. Oliver did not answer the question, and when Relator's investigator texted Ms. Oliver the following day a reminder of the situation regarding Patient JC, Ms. Oliver replied, in what the investigator understood to be a condescending or exasperated manner – in part because the solution was so obvious, and in part because Ms. Oliver rarely began texts by addressing Relator's Investigator by his name – "[Name,] we can have one of our Mds [M.D.'s, *i.e.*, doctors] do a F2F [face-to-face] and get the order."

157. Further, Ms. Oliver cannot have had any legitimate basis for disagreeing with the diagnosis of the non-Defendant SNF's doctor because Ms. Oliver is not clinically trained nor licensed to practice medicine, nor had she personally seen the patient in question.

158. Instead, Ms. Oliver knew that "we can . . . get the order" for Patient JC because it was Supportive's regular practice to admit unqualified patients using its own clinical staff to write the necessary fraudulent orders.

159. Just as Ms. Oliver had directed, Patient JC was admitted to hospice with a diagnosis of senile degeneration of the brain, even though it was not medically reasonable to diagnose her with only six months to live, which is why the SNF's doctor was unwilling to provide that diagnosis.

**(b) Medicare Patient EDL – ASCVD**

160. Another example is Patient EDL, a Medicare beneficiary, born January 31, 1926.

161. On February 19, 2024, Patient EDL was referred to Supportive by staff at Martin Luther King Hospital.

162. That afternoon, Supportive employee Tina Alexander e-mailed Supportive's admitting team, stating "I am not seeing a hospice diagnosis for this referral" and directing Jackie Lopez, a Supportive Director of Nursing Care Services, to "take a look please" to see if she could come up with a qualifying diagnosis.

163. Likewise, Ms. Lopez admitted that she could not "see[] a clear dx [diagnosis,] either."

164. Seeing that Supportive would lose revenue if it did not admit this patient, Senior VP of Patient Operations, Kendra Oliver, sprang into action, directing the team to "have tuck-in nurse reach out to the on-call MD" to "assist" with finding a hospice-qualifying diagnosis.

165. That evening, Supportive admitted Patient EDL to its hospice care, with a diagnosis of ASCVD – Atherosclerotic Cardio-Vascular Disease.

166. Thereafter, as part of its routine operations, Supportive falsely certified to CMS that Patient EDL had less than six months to live and billed CMS for Patient EDL's un-needed hospice care, claims that would never have been submitted in the absence of Defendant Supportive's illegal schemes.

**(c) Private Insurance Patient BA – Liver Cirrhosis**

167. Similarly, Patient BA, born August 7, 1978, had ascites and cirrhosis of the liver.

168. Patient BA was on private insurance, rather than Medi-Cal or Medicare.

169. Supportive's actions were typical of its disregard for its patients' true medical condition, regardless of insurer.

170. In patients with cirrhosis, albumin levels fall as the synthetic function of the liver declines with worsening cirrhosis, since albumin is exclusively synthesized in the liver.

171. Further, cirrhosis causes a monotonic decline in liver function; while the decline in liver function may slow, it does not improve over time.

172. Supportive was well aware that albumin levels above 2.5 g/dL indicate the liver is still functioning well enough that a six-month terminal diagnosis is not appropriate for hospice care.

173. As of January 20, 2025, Patient BA's albumin levels were 3.0 g/dL.

174. Thus, even in January of this year, Patient BA was ***still*** not an appropriate patient for hospice care.

175. Unsurprisingly, eight months previously, on or about May 6, 2024, Patient BA's albumin levels were even better: 3.2 g/dL; nevertheless, Supportive admitted him to its hospice care at that time in May, 2024, with a supposedly-qualifying diagnosis of liver failure.

176. Also unsurprisingly, despite needing a terminal diagnosis of six months or less to live in order to qualify for hospice care, Patient BA was still alive eight months after his initial admission to Supportive.

177. Patient BA may well still be alive today with albumin levels above 2.5 g/dL; Relator and its investigator are unaware of Patient BA's status and the investigator is no longer employed at Supportive, but given Patient BA's adequate

liver function as of January of this year, it is not implausible that Patient BA is still alive as of the filing of this Complaint.

**(d) Medi-Cal Patient EC – ASCVD**

178. Another example is Patient EC, born January 31, 1938, who was a Medi-Cal beneficiary, covered through Medi-Cal's L.A. Care Health Plan.

179. On July 31, 2024, Patient EC was referred to Supportive by a case-manager ("Dawn") at PIH Health Downey Hospital.

180. Early the following afternoon, around 1:30 pm on August 1, 2024, following Supportive's standard procedures, Relator's investigator asked Ms. Molina to "put together an LOA [Letter of Authorization] for [Patient EC] to go to Studebaker Healthcare." The investigator included a request for a false claim for GIP billing: "GIP rate set to $1,100", meaning billing for un-needed GIP care at $1,100 per day.

181. Later that same afternoon, at 2:50 pm, Supportive Operations Manager Yvette Molina e-mailed Supportive's admitting team with the Subject " . . . [Patient EC]," saying "Team[,] can we get a Dx [diagnosis] plz."

182. Four minutes later, a member of Supportive's nursing staff, Halei Viescas, replied "Reviewing now," referring to the patient's medical records.

183. Ms. Viescas was unable to find a qualifying hospice diagnosis, but this did not deter the Supportive team from admitting Patient EC.

184. Both Relator's investigator and SVP Kendra Oliver checked in on the progress for admitting Patient EC to hospice care. At 3:13 pm, the investigator asked, "Hi Yvette, is there an update on the LOA, facility is ready to sign." There was no immediate response from Ms. Molina, so approximately 20 minutes later, SVP Oliver followed up, asking "Yvette[,] is there an update?"

185. Yvette checked in with Ms. Viescas, but because Ms. Viescas was unable to find a hospice-qualifying diagnosis, Yvette responded to Relator and

Supportive VP Oliver that "I'm being told we don't have Dx," *i.e.*, a hospice-qualifying diagnosis.

186. Because Supportive's typical practice was to use fraudulent diagnoses that were qualitative (such as ASCVD, senile degeneration or dementia) when a patient lacked a hospice-qualifying diagnosis, Relator understood that Supportive was not going to let let Patient EC's non-terminal health status derail the admission train.

187. Instead, at 3:50 pm, following Supportive's and SVP Oliver's standard practices, Relator asked Operations Manager Yvette Molina to "send me the LOA[.] We still need to get that ready[,] Admins leaving soon."

188. Relator's deep familiarity with Supportive's and SVP Oliver's directions and standard practices was vindicated shortly thereafter; at 3:59 pm, SVP Kendra Oliver informed the investigator and Operations Manager Yvette Molina that "She[']s sending it now. A nurse is going to assess."

189. Shortly thereafter, at 4:20 pm, Ms. Viescas e-mailed the Supportive Referrals team, including Ms. Molina and Relator, that Supportive was "Going to send nurse to eval."

190. That evening, Supportive admitted Patient EC to its hospice care, as with many other non-terminal patients, with a "HDx[:] ASCVD" – a hospice-qualifying diagnosis of Athero-Sclerotic Cardio-Vascular Disease.

191. Initially, L.A. Care denied these claims because of the qualitative nature of the diagnosis.

192. As Dr. Chuong, Medical Director Reviewer at L.A. Care explained, the claims were "denied . . . because the rules [for hospice care] are not met." (REV-PATT-000007585).

193. In particular, he emphasized that L.A. Care did ***not*** receive "facts that show your doctor feels [Patient EC has] six months to live." As a result, L.A. Care found that the claim was "not medically necessary."

194. Thereafter, Supportive falsely certified to L.A. Care that Patient EC had less than six months to live and, via claims submitted to L.A. Care, caused Medi-Cal to pay for Patient EC's un-needed hospice care, claims that would never have been paid or submitted in the absence of Defendant Supportive's illegal schemes.

**COUNT I**

**Federal False Claims Act — Causing the Submission of False Claims to the United States, 31 U.S.C. § 3729(A)(1)(A)**

195. Relator re-alleges and incorporates the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

196. Relator seeks relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

197. As described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

198. As a result of these false claims, the United States has been damaged in a substantial amount and continues to be damaged, in an amount yet to be determined.

199. Additionally, the United States is entitled to the maximum penalty of $21,562.80 for each and every false and fraudulent claim made or caused to be made by any Defendant and arising from Defendants' fraudulent conduct, as described herein.

**COUNT II**

**Federal False Claims Act – Causing the Submission of False Claims to the United States, U.S.C. § 3729(a)(1)(B)**

200. Relator re-alleges and incorporates the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

201. Relator seeks relief against Defendants under Section 3729(a)(1)(B) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

202. As described above, Defendants knowingly made, used, or caused to be made or used false records and statements material to false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

203. As a result of these false claims, the United States has been damaged in a substantial amount and continues to be damaged, in an amount yet to be determined.

204. Additionally, the United States is entitled to the maximum penalty of $21,562.80 for each and every false and fraudulent claim made or caused to be made by any Defendant and arising from Defendants' fraudulent conduct, as described herein.

**COUNT III**

**Federal False Claims Act – False Claims Conspiracy, U.S.C. § 3729(a)(1)(C)**

205. Relator re-alleges and incorporates the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

206. Relator seeks relief against Defendants under Section 3729(a)(1)(C) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

207. As described above, Defendants conspired to make, use, or cause to be made or used, false records and statements material to false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(C).

208. As a result of these false claims, the United States has been damaged in a substantial amount and continues to be damaged, in an amount yet to be determined.

209. Additionally, the United States is entitled to the maximum penalty of $21,562.80 for each and every false and fraudulent claim made or caused to be made by any Defendant and arising from Defendants' fraudulent conduct, as described herein.

**COUNT IV**

**California False Claims Act – Cal. Gov't Code §12651(a)(1) and (2)**

210. Relator re-alleges and incorporates the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

211. This is a claim for treble damages and penalties under the California False Claims Act.

212. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the California State Government for payment or approval.

213. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

214. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' illegal schemes.

215. By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

216. The State of California is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendant.

217. This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the same facts as the federal claims, but asserts separate damages to the State of California in the operation of its Medicaid program.

**COUNT V**

**California Insurance Fraud Prevention Act – Cal. Ins. Code §1781.7**

218. Relator re-alleges and incorporates the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

219. This is a claim for treble damages and penalties under California's Insurance Fraud Prevention Act, Ins. Code §1781.7 ("IFPA").

220. Under the IFPA, it is illegal to employ "cappers, runners, steerers, or other persons . . . to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or their insurer." Ins. Code §1781.7.

221. As a result of the conduct in violation of Ins. Code § 1871.7 described in this Complaint, Defendants are subject to civil penalties and assessments set forth therein.

**PRAYER FOR RELIEF**

WHEREFORE, Relator prays for judgment against Defendants, in an amount to be proved at trial, as follows:

i. That Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729-33, and the California False Claims Act, as set forth herein;

ii. That as to Counts I – IV, Defendants pay damages and penalties of not less than $10,781.40 and not more than $21,562.80 per false claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015 (28 U.S.C. § 2461), plus three times the amount of damages the United States and the State of California have each sustained because of their actions;

iii. That as to Counts I – IV, Relator be awarded the maximum "relator's share" allowed, pursuant to 31 U.S.C. § 3730(d) and equivalent provisions of the California False Claims Act;

iv. That as to Count V, civil penalties of $10,000 be imposed for each and every fraudulent claim Defendants solicited, accepted, referred, presented, and/or caused to be presented pursuant to a contract of insurance;

v. That as to Count V, an assessment of three times the amount of each claim for compensation pursuant to contract of insurance be imposed;

vi. That as to Count V, Defendants pay assessments sufficient to disgorge their unlawful profit, provide restitution for their fraudulent conduct, compensate the State for the costs of investigation and prosecution, and alleviate the social cost of increased insurance rates due to fraud;

vii. That as to Count V, Relator be awarded the maximum percentage of any recovery allowed to him pursuant to Cal. Ins. Code § 1871.7(g);

viii. That as to all Counts, pre- and post- judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which were incurred in bringing and pressing this case; and

ix. That as to all Counts, this Court award such additional relief as it deems proper.

**DEMAND FOR JURY TRIAL**

Plaintiff-Relator demands a trial by jury on all issues triable of right by jury.

DATED: November 20, 2025 **SAWYER & LABAR LLP**

By: ______________________
Adrian Sawyer

Adrian Sawyer, State Bar No. 203712
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, CA 94111
Tel.: (415) 262-3820
sawyer@sawyerlabar.com

Rebecca MacLaren, State Bar No. 211788
SAWYER & LABAR LLP
6060 Center Drive, 10th Floor
Los Angeles, California 90067
Tel.: (310) 341-2922
maclaren@sawyerlabar.com

Ross B. Brooks (to be admitted *pro hac vice*)
**BROOKS LLC**
8 West 126th Street, 3rd Floor
New York, NY 10027
Telephone: (212) 516-6475
Ross@BrooksLLC.com

*Attorneys for Plaintiff-Relator,*
*ElderCare Watch, LLC*